Beatrice Burns offered for probate a document she contended was the last will and testament of Grady Marshall, Sr. It was contested by Grady Marshall, Jr. Burns appeals from a judgment based on a jury verdict in favor of the contestant. We reverse the judgment of the probate court.
Following the death of Grady Marshall, Sr. ("Grady Sr."), on March 3, 1997, Beatrice Burns ("Beatrice") petitioned to probate the document she offered as his will. Grady Marshall, Jr. ("Grady Jr."), the decedent's son, filed a contest, alleging that the will was invalid because, he contended, his father's signature on that will was, in fact, a forgery. Alternatively, Grady Jr. contended that the will was invalid on the basis that his father had lacked the testamentary capacity to execute a will, and he contended that the will did not express the true intent of Grady Sr. Pursuant to § 43-8-190, Ala. Code 1975, a jury trial was held in the Probate Court of Mobile County. The probate judge denied Beatrice's motion for a directed verdict and submitted the case to the jury. The jury returned a general verdict in favor of Grady Jr. The probate judge subsequently denied Beatrice's motion for a JNOV or for a new trial and entered a judgment in favor of Grady Jr.
The following evidence was presented:
 Grady Sr. was born on May 28, 1916. He was married to Nettie Burns. He served in the military forces during World War II. He and Nettie lived in Mobile; she was a teacher, he was the neighborhood junk man. Grady Sr. had one son, Grady Jr., and a stepson, Willie Burns. Grady Jr. lived in Laurel, Mississippi; Willie Burns lived in Prichard.
Following his wife's death in 1992, Grady Sr. lived alone, at his home in Mobile. Grady Sr. was considered to be "a strange character," but mentally competent. In January 1995, Grady Sr. experienced some breathing difficulties and was taken to the emergency room of a local hospital. He was released later that day. His medical records while at the hospital indicated that while at the hospital he was alert and oriented as to person, place, and date. Several months later, the Mobile County Department of Human Resources ("DHR") became concerned that Grady Sr. was not spending his money appropriately. As a result of his spending practices, he lacked the funds to pay his basic living expenses. Cartia Mosley, an employee of DHR, was assigned to investigate the situation. She visited with Grady Sr. on a number of occasions. In her opinion, Grady Sr. was mentally competent; he was able to inform Mosley who his relatives were and how to contact Grady Jr. in Mississippi. When Mosley attempted to convince Grady Sr. that he needed to pay his bills before making other expenditures, he told her that it was his money and that he would spend it as he pleased. Mosley then contacted Grady Jr. and apprised him of the situation with his father. Mosley recommended that Grady Sr.'s Social Security check be sent to a responsible relative willing to use the money to pay Grady Sr.'s bills. Grady Sr. and Grady Jr. agreed to this plan, and the Social Security checks were sent to Grady Jr. Despite this, Grady Sr.'s financial problems continued, and his utilities were turned off on several occasions. On March 3, 1995, Grady Sr. executed a durable power of attorney and appointed his niece, Alice B. Nelson, as his attorney-in-fact.
Beatrice is the daughter of Grady Sr.'s stepson Willie Burns. She testified that she had regarded Grady Sr. as her grandfather. During 1995, she saw Grady Sr. regularly because he often drove over to check on some property he owned near where she lived with her fiancé, Albert Rogers. Beatrice, who worked two jobs, delivered food to Grady Sr.'s house six times per week. At some point, Grady Sr. began receiving notices from the city concerning the condition of his yard. Beatrice *Page 350 
telephoned Grady Jr. and asked for his help in taking care of the matter. Instead, Grady Jr. came to Mobile and talked to DHR about the possibility of having his father put in a nursing home.
During May 1995, Grady Sr. again experienced difficulty breathing and, on two occasions in that month, was taken to the emergency room of a local hospital. Grady Sr.'s medical records indicated that on the first of those emergency-room visits, which came on May 6, he was oriented as to person. The other visit came on May 31; the medical records related to that visit indicated that he was oriented as to person, age, and place, but not as to the date. Upon discharge, Grady Sr. was instructed to make a follow-up visit to the Stanton Road Medical Clinic in a week.
On July 8, 1995, Grady Sr. drove to Prichard, as he frequently did. Grady Sr. went first to a place of business known as Al's Tires, owned by Albert Rogers. Grady Sr. asked Albert to walk next door with him to Memorial Funeral Home. At the funeral home, Grady Sr. visited with the owner, Bishop Cornelius Woods, while Rogers remained in a reception area.
Grady Sr. told Woods that he wanted to prepare a will. Grady Sr. stated that he wanted to leave $500 to his son Grady Jr.; $500 to his stepson, Willie Burns; and the remainder of his estate to Beatrice. According to Woods, Grady Sr. stated that he wanted to leave most of his estate to Beatrice because she was the only person taking care of him. Woods, who had known Grady Sr. for over 40 years, helped Grady Sr. draft a simple will, then had his niece type up the final version. At that point, Albert Rogers was called into the room and was asked to witness Grady Sr.'s signing the will. Both Rogers and Woods signed as witnesses. Both testified that they believed Grady Sr. was of sound mind when he signed the will and that he executed the will freely and voluntarily. Mary Love, Woods's sister, notarized the men's signatures; Grady Sr. and Rogers then left the funeral home. The will was left with Woods for safekeeping.
In 1996, doctors determined that Grady Sr. was suffering from Alzheimer's disease. On September 1, 1996, the Mobile County Probate Court appointed Beatrice as his guardian. Beatrice became the named payee on Grady Sr.'s Social Security check. Grady Sr. also received a monthly check from the Department of Veterans Affairs; it continued to be issued in his own name. Beatrice used the proceeds of the Social Security check for Grady Sr.'s expenses; Grady Sr. kept the proceeds of his veteran's check and spent it as he wished.
On March 3, 1997, Grady Sr. died. According to Beatrice, she did not telephone Grady Jr. to tell him of his father's death, because, she said, Grady Sr. had instructed her not to do so. Beatrice also testified that she knew nothing about Grady Sr.'s will until Bishop Woods announced during the funeral that he had possession of it. Beatrice stated that Grady Sr. was "hardheaded" and did what he wanted to do. She acknowledged that she had been the beneficiary of a $3,000 policy insuring the life of Grady Sr.; however, she testified, the entire proceeds of the policy were used to pay for Grady Sr.'s funeral.
Although Beatrice, as the appellant, raises three issues, the dispositive issue is whether Grady Jr. presented sufficient evidence to withstand Beatrice's motions for a directed verdict and for a JNOV.[1]
A motion for a directed verdict and a motion for JNOV test the sufficiency of the evidence in the same way. Berryhill v.Barnett, 590 So.2d 343 (Ala.Civ.App. 1991).
 "[The applicable standard of review] is whether the nonmoving party has presented substantial evidence in support of *Page 351 
his position. If he has not, then a directed verdict is proper. Bailey v. Avera, 560 So.2d 1038, 1039 (Ala. 1990); see Ala. Code 1975, § 12-21-12(a). Substantial evidence is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). The ultimate question is whether the nonmovant has presented substantial evidence to allow submission of the case or issue to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992)."
Smith v. Vice, 641 So.2d 785, 786 (Ala. 1994). Because the jury returned a general verdict in favor of Grady Jr., we must address each of the three grounds he raised as the basis for his will contest.
 Forgery
The proponent of a contested will has the burden of making a prima facie showing that the will is valid, by offering testimony showing the execution of the will by the testator and the attestation of the will by the witnesses, as prescribed by Alabama law. Anderton v. Latham, 342 So.2d 779, 780 (Ala. 1977). Once the proponent presents prima facie proof of the validity of the will, the contestant must then come forward with evidence indicating that the testator did not sign the will or evidence indicating some other reason not to probate the will. Id.
As the proponent, Beatrice offered the testimony of Albert Rogers and Bishop Woods, the two witnesses to the will, as well as the testimony of Mary Woods Love, the notary public who notarized the signatures on the will. Rogers and Woods testified that Grady Sr. indicated to them that he was executing his will and that he then signed the will. Rogers testified that after the three of them had signed the will, Mary Love came in and notarized the will. However, Mary Love, the sister of Bishop Woods, testified that she witnessed the signatures of Grady Sr. and his two witnesses, before affixing her notary seal to the will. Love testified that she was acquainted with all three men and saw no need to ask for any identification before notarizing Grady Sr.'s will. She stated that if her signature on the will was slightly different from her usual signature, it was because she had cut her finger earlier and, as a result, had been experiencing difficulty in writing.
Grady Jr. maintained that his father's signature was a forgery. He also questioned the validity of Mary Love's signature. He offered no expert testimony concerning the validity of either signature. Instead, he submitted copies of the durable power of attorney executed by Grady Sr. in March 1995, an "Affidavit for Non-filing Income Tax" that Grady Sr. had executed in 1990, and a tax-return list for real and personal property that Grady Sr. had signed in 1993 and 1994, for comparison against the signature on the 1995 will. Grady Jr. also offered a copy of Mary Love's notary-public paperwork in support of his contention that the signatures on the will were forgeries.
An "acknowledgment" is a formal admission, before an officer, by one who has executed an instrument that the instrument is his act and deed. Jemison v. Howell, 230 Ala. 423, 161 So. 806
(1935). The testimony of a notary public that the attestation and acknowledgment of an instrument are in his handwriting is sufficient evidence of execution. This Court stated in Jordan v.Conservation Land Co., 273 Ala. 99, 134 So.2d 777 (1961):
 "[T]he certificate of a notary unless and until impeached is conclusive of the facts therein stated which the officer is by law authorized to state and to impeach it the evidence should be clear and convincing, reaching a high degree of certainty, leaving in the mind no fair, just doubts."
273 Ala. at 102, 134 So.2d at 779.
Because the jury returned a general verdict in favor of the contestant, we do *Page 352 
not know whether the jury determined that the signature purporting to be Grady Sr.'s signature was a forgery. We have examined the record, including each of the documents containing the signature of Grady Sr. The signatures offered by Grady Jr. do not constitute substantial evidence indicating that the signatures on the 1995 will were, in fact, forgeries. ComparePeterman v. Auto-Owners Ins. Co., 623 So.2d 1059, 1061 (Ala. 1993) (summary judgment in favor of defendants reversed; plaintiff presented substantial evidence indicating that the signature on the personal indemnity agreement was not his, by offering the testimony of a handwriting expert who determined that the signature on the agreement was not the plaintiff's).
 Undue Influence
A presumption of undue influence arises when: (1) there is a confidential relationship between a favored beneficiary and the testator; (2) there is a dominant and controlling influence by the beneficiary over the testator; and (3) there is undue activity in procuring the execution of the will. Ex parte Baker,709 So.2d 7, 9 (Ala. 1997); Allen v. Sconyers, 669 So.2d 113, 117 (Ala. 1995).
In order to prevail on a claim of undue influence, a party must establish each of these elements. Sessions v. Handley,470 So.2d 1164, 1166 (Ala. 1985).
There is no question that a confidential relationship existed between Grady Sr. and Beatrice, his favored beneficiary. The evidence is not quite so clear whether Beatrice had a dominant and controlling influence over Grady Sr. The evidence established that Grady Sr. was a strong-willed person, but that he depended upon Beatrice to provide him with daily meals and to make sure that his basic needs were attended to. However, there was also evidence indicating that when Grady Sr. executed a durable power of attorney in March 1995, he did not appoint Beatrice as his attorney-in-fact, but appointed his niece, Alice B. Nelson. Moreover, there was evidence indicating that Grady Jr. controlled his father's financial affairs during at least a part of 1995. Cartia Mosley testified that she spoke with Grady Jr. during the DHR investigation of Grady Sr.'s ability to care for himself. At Ms. Mosley's suggestion, Grady Sr. agreed to have his Social Security check sent to Grady Jr. so that Grady Jr. could see to it that his father's monthly bills were paid. Furthermore, when Grady Sr. had to be taken to the emergency room in May 1995, it was Grady Jr. who spoke to hospital and DHR officials regarding the possibility of having his father put in a nursing home. It was not until 1996 — more than one year after the will was executed — that the probate court appointed Beatrice as Grady Sr.'s guardian, thus granting her control over all his household, medical, and financial affairs. In short, Grady Jr. failed to present substantial evidence indicating that Beatrice exercised a dominant and controlling influence over Grady Sr. at the time he executed his 1995 will.
Moreover, Grady Jr. also failed to present substantial evidence indicating that Beatrice played an active role in procuring the execution of Grady Sr.'s 1995 will. Beatrice did not accompany Grady Sr. when he executed the new will. Indeed, the evidence established that on July 8, 1995, Grady Sr. drove by himself to Albert Rogers's business. He asked Rogers to go with him to see Bishop Woods. Although he did not know the purpose of Grady Sr.'s visit to Woods, Rogers agreed to Grady Sr.'s request. There was no evidence to indicate that Beatrice had any knowledge of Grady Sr.'s intent to make a new will until after he had executed the new will. "`There must be evidence, in addition to the fact of relationship, of active interference in procuring the execution of the will.'" Sessions v. Handley, 470 So.2d at 1167
(quoting Arrington v. Working Woman's Home, 368 So.2d 851 (Ala. 1979)).
"Evidence [offered to support a claim of] undue influence must provide at *Page 353 
least a reasonable inference rather than mere suspicion."Jackson v. Davis, 398 So.2d 242, 245 (Ala. 1981). Grady Jr. failed to present substantial evidence indicating that Beatrice exerted undue influence over Grady Sr.
 Testamentary Capacity
Beatrice also contends that Grady Jr. failed to present substantial evidence indicating that Grady Sr. lacked testamentary capacity. To have testamentary capacity, one must possess
 "mind and memory sufficient to recall and remember the property she [is] about to bequeath, and the objects of her bounty, and the disposition which she [wishes] to make — to know and understand the nature and consequences of the business to be performed, and to discern the simple and obvious relation of its elements to each other."
Ex parte Baker, 709 So.2d 7, 10 (Ala. 1997) (quoting Bolan v.Bolan, 611 So.2d 1051, 1057 (Ala. 1993). Every person is presumed to have the capacity to make a will. Smith v. Vice,641 So.2d at 786.
Grady Jr. presented evidence indicating that his father was diagnosed with Alzheimer's disease in 1996, approximately one year after he had executed the 1995 will, and that a guardian had to be appointed for him in September 1996. Grady Jr. also offered testimony from a clinical psychologist who examined Grady Sr. in 1996. It was the psychologist's opinion that Grady Sr. had probably been suffering from some degree of Alzheimer's disease for at least a year before he was diagnosed.
Beatrice, however, offered evidence indicating that Grady Sr. had continued to live by himself. She offered the testimony of various persons who encountered Grady Sr. on an almost daily basis as he drove himself around the Mobile area to visit acquaintances and to check on his property. Albert Rogers testified that on July 8, 1995, Grady Sr. appeared to be in full possession of his faculties. According to Rogers, on that date Grady Sr. arrived at his place of business and asked Rogers to go next door with him to see Bishop Woods at the Memorial Funeral Home.
Bishop Woods, who had known Grady Sr. for over 40 years, testified that Grady Sr. came by almost every day to have coffee with him. He testified that Grady Sr. appeared to be of sound mind on July 8, 1995. Woods testified that Grady Sr. was not an educated man and that he had asked for help in wording his will so that it would reflect his wishes. Grady Sr. told Woods that he wanted to leave $500 each to his son Grady Jr. and his stepson Willie Burns, with the remainder of his estate going to Beatrice Burns. According to Woods, Grady Sr. told him that he wanted his will drawn up this way because Beatrice was the person who had taken care of him and had seen to his needs. After the will was typed up, Woods and Rogers witnessed it and Mary Love notarized the signatures. Everyone present testified that they believed that Grady Sr. was fully aware of what he was doing, and that they believed he executed the will freely and without coercion. Moreover, although Grady Sr.'s medical records reflected various visits to the emergency room in 1995 and showed varying degrees of orientation, no evidence indicated that on the day Grady Sr. executed the will he lacked testamentary capacity. To the contrary, the evidence established that Grady Sr. knew the property he was about to bequeath, the objects of his bounty, and the disposition he wished to make. We hold that Grady Jr. failed to present substantial evidence indicating that his father lacked testamentary capacity when he executed his 1995 will.
Because Grady Jr. failed to present substantial evidence of forgery, undue influence, or lack of testamentary capacity, the probate court should have directed a verdict for Beatrice Burns. Therefore, the judgment of the probate court is reversed and a judgment is rendered in favor of Beatrice Burns. *Page 354 
REVERSED AND JUDGMENT RENDERED.
Hooper, C.J., and Houston, Cook, See, Johnstone, and England, JJ., concur.
[1] Rule 50, Ala.R.Civ.P., has renamed the "motion for a directed verdict" as a "motion for a judgment as a matter of law," and has renamed the "motion for a judgment notwithstanding the verdict" as a "renewed motion for a judgment as a matter of law."